IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

WILEMON FOUNDATION, INC. and
R.J. WILEMON, LLC,
    Plaintiffs,

v.                                      CIVIL NO. 1:19-CV-136-GHD-DAS

DANNY WAYNE WILEMON,
    Defendant.

<u>OPINION DENYING DEFENDANTS' MOTION TO STAY, ABSTAIN, OR DISMISS, OR
FOR PROTECTIVE ORDER</u>

This matter arises from a complaint by the Plaintiffs in which they assert claims against the Defendants for conversion; breach of fiduciary duty; fraudulent concealment; unjust enrichment and restitution; fraudulent misrepresentation; and breach of the duty of good faith and fair dealing [1]. As there is diversity between the parties and over $75,000 in dispute, jurisdiction is appropriate in this federal court. Presently before the Court is the Defendant's Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], using varying grounds to support these diverse arguments [63]. The Plaintiffs responded in opposition to the Defendant's motion [68], the Defendants replied to the Plaintiff's response [70], and the Defendants' motion is now ready for review. The Court will first present the relevant facts, and then address each of the Defendant's arguments in turn. That said, for the reasons presented herein, Defendant's Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62] is DENIED.

                              **I.**      **<u>Factual Background</u>**

R.J. Wilemon was a successful businessman in and around Lee County, Mississippi, who operated a construction and land development company under the names of R.J. Wilemon Construction Company, Wilemon Properties, and, finally, R.J. Wilemon, LLC (herein referred to

as "Company") [69, at 1]. The Company built and managed a large number of apartments and rental houses; it also held vacant lots for development [*Id.*]. R.J. Wilemon held all of the interest in the Company, and was its only member [*Id.*]. R.J. Wilemon also established a nonprofit charity called the Wilemon Foundation, Inc. (herein referred to as "Foundation") [*Id.*]. He was the father of the Defendant, Danny Wayne Wilemon, who served as the manager of the Company [*Id.*, at 2]. R.J. Wilemon named his granddaughter, Shonda Wilemon Sharpe—who is also the daughter of the Defendant [70, at 2]—as the Director of the Foundation, and she is now the Chairman of the Board and President of the Foundation [69, at 1-2].

Following the death of R.J. Wilemon, the Foundation received a large capital endowment bequest from his estate, as well as full ownership and control of the Company, with the profits from the Company to be paid to the Foundation's endowment [*Id.*, at 2]. Following R.J. Wilemon's death, the Company ceased building houses, and engaged primarily in the management of the leased and undeveloped properties [*Id.*]. The Foundation decided to liquidate the Company's assets, and to transfer the funds in excess of the cost of operation to the Foundation's endowment [*Id.*]. As the manager of the Company, the Defendant was responsible for the management of the Company's rental and undeveloped properties and the liquidation of the Company's assets [*Id.*].

In an initially unrelated matter, Ms. Sharpe sold her former home to the Defendant, on the condition that the Defendant purchase a new freezer for her new home similar to the freezer she was leaving behind [*Id.*, at 3]. In August or September of 2016, Ms. Sharpe came across the delivery invoice for the freezer, and discovered that the Company, rather than the Defendant, paid for the freezer [*Id.*, at 2-3]. Upon finding that the Defendant was using the Company to pay for his own expenses in this personal matter, Ms. Sharpe arranged for a meeting with Greg

2

Pirkle, the Foundation's attorney, and two representatives from BancorpSouth, Connie Young and Jack McFerrin [*Id.*, at 3]. The meeting took place on October 7, 2016 [*Id.*]. At the meeting, Ms. Sharpe requested that Ms. Young determine if a $3,500 check from Ms. Sharpe—used by Ms. Sharpe to purchase a surplus tractor and backhoe from the Company on March 16, 2016—had been deposited into the Company's operating account [*Id.*]. The Defendant had signed the Bills of Sale transferring ownership of the tractor and backhoe from the Company to Ms. Sharpe [*Id.*]. Ms. Young told Ms. Sharpe that she was unable to find Ms. Sharpe's $3,500 check in the Company's account [*Id.*]. Shortly after that meeting, the accounting firm Nail McKinney was hired to conduct a limited audit of the Company [*Id.*], and the firm returned their audit report on February 14, 2017 [*Id.*]. The audit report uncovered discrepancies between the expected rental income for the Company and the figure recorded in the Company's general ledger, and a discrepancy between the Company's bank statement in a random month (December 2016) and the amount recorded in the Company's general ledger [69-1, at 7-9]. However, according to the Plaintiffs, the audit report did not indicate any wholesale conversion of Company income [69, at 3]. On March 10, 2017, Ms. Sharpe met with Tupelo Police Detective Scott Floyd and reported that her $3,500 check had not been deposited into the Company's operating account [*Id.*, at 3–4].

On June 21, 2017, the Defendant was removed as manager of the Company and as Chairman of the Foundation's Board [*Id.*, at 4]. On the same day, records were removed from the Company office to ensure their preservation [*Id.*]. The Plaintiffs allege that inspection of these records indicated several questionable practices related to the diversion of Company funds to the Defendant [*Id.*]. In late 2018, a search warrant was issued for the Defendant's BancorpSouth account records and, according to the Plaintiffs, it was determined that Company funds had been deposited into an account maintained by the Defendant [*Id.*]. There is an

ongoing state criminal investigation of the Defendant for embezzlement of the Company's funds, which parallels this civil action [*Id.*, at 4; 63, at 2-3].

The Plaintiffs filed their Complaint on July 19, 2019, seeking $750,000 from the Defendant, plus interest, cost of collection, punitive damages, and reasonable attorney's fees [1, 15-16]. Specifically, the Plaintiffs contend that the Defendant converted: the $3,500 check from Ms. Sharpe [1, ¶ 34]; at least $23,335.59 in refund checks to the Company [*Id.*, ¶ 35]; at least $75,360.32 from the Company's PayPal account [*Id.*, ¶ 36]; and $378,132.54 in two checks to the Company that had been accumulated by the Company through the sale of assets in a specific trust account known as the Phelps Dunbar Trust Account [*Id.*, ¶ 37]. The Plaintiffs note that as the Defendant was being removed as manager from the Company, he provided a cashier's check to Greg Pirkle, the Foundation's attorney, for $178,742.54, leaving $199,390 of the money from the Phelps Dunbar Trust Account sale unaccounted for [*Id.*]. The Plaintiffs also contend that the Defendant converted cash payments made to the Company [*Id.*, ¶ 38], used company credit cards for his own personal gain and submitted for reimbursement from the Company charges made to his personal credit cards for items unrelated to his work as the Manager of the Company, and paid for personal expenses out of the Company's account [*Id.*, ¶ 39]. The Plaintiffs further allege that the Defendant has failed to return home office equipment that had been purchased by the Company for his use while serving as Manager [*Id.*, ¶40]. In response to these allegations, the Defendant has characterized this civil action as merely a "daughter-daddy" dispute [70, at 5, n. 8].

4

## II. The Court Rejects the Defendant's Argument That This Civil Action Should Be Stayed While the State Criminal Proceeding is Pending

The Defendant argues that this proceeding should be stayed in light of the ongoing state criminal action against him, alleging that to do otherwise would harm his Fifth Amendment rights [63, at 3-4]. When determining whether to stay a civil action because of a parallel criminal case, courts in the Fifth Circuit consider six factors: "(1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the criminal case, including whether the defendant has been indicted; (3) the private interests of the plaintiff in proceeding expeditiously, weighed against the prejudice to the plaintiff caused by a delay; (4) the private interests of and burden on the defendant; (5) the interests of the courts; and (6) the public interest." *See Alcala v. Texas Webb County*, 625 F. Supp. 2d 391, 398-99 (S.D. Tex. 2009) (collecting district court cases within the Fifth Circuit that have applied this test). This Court takes each factor in turn below.

### A. The Extent to Which the Issues in the Criminal Case Overlap With Those Presented in the Civil Case

The Defendant has yet to be indicted, and therefore "it is simply a matter of speculation whether the civil action and the pending criminal investigation overlap." *See Modern American Recycling Services, Inc. v. Dunavant*, 2012 WL 1357720, at *3 (April 19, 2012 E.D. La.). The Defendant has only blankly stated his own conclusory statements, and failed to provide sufficient evidence from which this Court could conclude that the two proceedings substantially overlap. While the two proceedings involve conversion and embezzlement, it is unclear to what degree these proceedings overlap. In point of fact, the only evidence introduced into the record on this front originates from the Plaintiffs, who have presented a Tupelo Police Department Incident

5

Report alleging embezzlement of Ms. Sharpe's $3,500 check payment for the purchase of heavy machinery from the Foundation [69-1, at 19-21]. This single piece of evidence does not prove that the criminal investigation overlaps with this civil action beyond this relatively minor incident. Given the dearth of details regarding the state criminal proceeding and the lack of an indictment in this case, the Court finds that this factor militates against granting a stay, or is at best neutral.

### B. The Status of the Criminal Case, Including Whether the Defendant Has Been Indicted

Again, there is no evidence in the record regarding the status of the criminal investigation against the Defendant, other than the statement from the Defendant that it is ongoing. There is no indication that an indictment is imminent, or even that one will be forthcoming at all. These facts weigh against granting a stay in this case.

### C. The Private Interests of the Plaintiff in Proceeding Expeditiously, Weighed Against the Prejudice to the Plaintiff Caused by a Delay

"[T]he Court notes that a plaintiff has an interest in the speedy resolution of its case." *Modern American Recycling Services, Inc. v. Dunavant*, 2012 WL 1357720, at *4 (April 19, 2012 E.D. La.). Given that this case has been working its way through the system since it was filed on July 19, 2019 (over 14 months ago) and it is reasonable to expect further delays due to the COVID-19 pandemic, any additional hurdles should be avoided if at all possible. Thus, this factor supports a finding against granting a stay in this case.

### D. The Private Interests of and Burden on the Defendant

"The primary burden on [the Defendant] alleged here is that allowing this suit to proceed will create a significant risk of endangering his Fifth Amendment rights. However, it is not

6

unconstitutional to force a defendant to choose between the negative inferences drawn from his silence and his Fifth Amendment privilege." *Id.* Furthermore, a party seeking a stay must "make a specific showing of the harm it will suffer without a stay and why other methods of protecting its interests are insufficient." *In re Ramu Corp.*, 903 F.2d 312, 320 (5th Cir. 1990). A finding of good cause for a stay "must be accompanied by specific findings of fact and determinations" that the stay-seeking party "will suffer specific forms of prejudice." *Id.* The granting of a stay "is an extremely harsh consequence, which has been analogized to the consequences of granting a preliminary injunction." *Id.* Consequently, the Court "must consider means of ameliorating the stay's severe effects." *Id.* While the Defendant has argued that a denial of a stay would harm his Fifth Amendment rights, the Court is unconvinced that this conclusory statement alone rises to the level of specificity required for granting a stay. Regardless, a party seeking a stay must demonstrate how other means of protecting the party's rights would be insufficient. *Id.* In this case, the Defendant has done the opposite by requesting a protective order that would ensure the protection of his rights. As such, this factor weighs against the granting of a stay.

### E. The Interests of the Courts

"[C]ourts have an interest in moving cases forward expeditiously." *Modern American Recycling Services, Inc. v. Dunavant*, 2012 WL 1357720, at *5 (April 19, 2012 E.D. La.). Additionally, when considering whether to grant a stay in a civil action due to an ongoing criminal proceeding, a court "must carefully consider the time reasonably expected for" the resolution of the criminal proceeding, "in light of the principle that 'stay orders will be reversed when they are found to be immoderate or of an indefinite duration.'" *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir .1983) (quoting *McKnight v. Blanchard*, 667 F.2d 477, 479

7

(5th Cir. 1982) (vacating an indefinite and protracted stay where the court had not even weighed competing interests in ordering the stay)). "As a result, considerations of judicial expediency necessitate that this case not be postponed indefinitely on the chance that a criminal case might be brought based on the same actions that constitute the basis of this suit." *Modern American Recycling Services, Inc. v. Dunavant*, 2012 WL 1357720, at *5 (April 19, 2012 E.D. La.). Once again, this factor weighs against granting a stay in this case.

### F. The Public Interest

"[T]he public has an interest in the prompt resolution of civil cases." *Id.* at *6. While the public also has an interest in the efficient and economic use of the judicial system's resources—*see id.*—this Court has determined that a stay would not create any advantage in terms of judicial economy and efficiency. As a result, this factor also militates against granting a stay in this case.

### G. In Sum, the Factors Weigh Against Granting a Stay

These factors overwhelmingly demonstrate that granting a stay is unwarranted in this case, particularly in light of the fact that there has yet to be any indictments from the parallel criminal proceedings and no indication of when that proceeding would be resolved. Granting a stay in this case would be of an indefinite, and thus unacceptable, duration. Moreover, the Defendant has not demonstrated that other alternative means, such as a carefully crafted protective order, would protect his rights in a less restrictive way. Therefore, the Defendant's Motion to Stay, as included in their Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], is DENIED.

### III. This Court Will Not Abstain Due to the Ongoing State Criminal Investigation

The Defendant next argues that this Court should abstain from this civil action in light of the ongoing state criminal proceeding, and cites *Younger v. Harris* as support for this contention [63, at 5-6]. Yet he undercuts his own argument by conceding that this case does not "fit[] neatly within any one of the many abstention doctrines" [70, at 2, n. 4]. Instead, the Defendant argues that this case "fits Younger" merely because there is a similar state criminal investigation. However, this fact alone is patently insufficient to convince this Court that abstention under *Younger* is warranted, as are the Defendant's grossly speculative "what-ifs" about the possible outcomes of said criminal investigation. *Younger* stands for the proposition that "abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings." *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 816 (1976). There is no evidence in the record to support the notion that the Plaintiffs are invoking this Court as a means of restraining the state's criminal investigation. Moreover, this Court stresses that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* "[I]t was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it." *Alabama Pub. Serv. Comm'n. v. Southern R. Co.*, 341 U.S. 341, 361 (1951) (Frankfurter, J., concurring in result). This Court sees of no reason to break with these truisms. Consequently, the Defendant's Motion to Abstain, as included in their Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], is DENIED.

### IV.   This Court Will Not Dismiss the Complaint Due to the Statute of Limitations

Finally, the Defendant argues that the Plaintiffs' cause of action occurred outside the three-year statute of limitations [63, at 7]. As the Supreme Court of Mississippi has noted, when a court considers a motion to dismiss, the allegations in a complaint are taken as true and the court should only grant the motion if it is beyond doubt that the plaintiff will be unable to prove any of their facts supporting their claim. *See Covington County Bank v. Magee*, 177 So.3d 826, 828 (Miss. 2015). Mississippi Code Section 15–1–49's three-year statute of limitations, which applies to conversion claims like the ones in the case at bar, commences upon discovery of the injury or upon such time as a plaintiff using reasonable diligence should have discovered the injury. *Id.* Discovery of an injury is an issue of fact that should be decided by a jury when there is a genuine dispute. *Id.*

In the case *sub judice*, the Complaint was filed July 19, 2019, indicating that the statute of limitation covered actions that occurred on or after July 19, 2016, or actions that the Plaintiffs discovered or could have reasonably discovered, during that time frame. The Plaintiffs have argued that they discovered the Defendant's alleged transgressions during the appropriate time frame [69, at 12-14]. The Defendant argues that the Plaintiffs should have discovered, through reasonable diligence, the Plaintiff's alleged wrongdoings long before July 19, 2016, and that consequently the statute of limitations had already passed by the time the Plaintiffs filed their lawsuit [63, at 7-9]. Since there is a clear factual dispute as to when discovery of the injury occurred, or should have occurred, a jury should decide this factual issue. Therefore, dismissing this civil action is unwarranted.

The Defendant further argues that the Plaintiffs should be denied the opportunity to bring forward their lawsuit because the Defendant was allegedly smart enough to hide his suspected

10

wrongdoings well enough to evade detection for more than three years—i.e. the statute of limitations [63, at 7-9]. This argument is specious at best. The Defendant further argues that the Plaintiffs should be barred, under the doctrine of unclean hands, from bringing their lawsuit because Ms. Sharpe, the President of the Foundation—and by extension the controlling entity behind the Company—allegedly failed, in her oversight role, to catch the Defendant's alleged wrongdoings [*Id.*, at 9]. However, the Defendant has failed to demonstrate how this alleged failure to oversee the Defendant adequately translates into a violation of good faith that would bar the Plaintiffs from proceeding with their lawsuit. The Defendant has not demonstrated that the Plaintiffs acted unreasonably in their failure to uncover the Defendant's allegedly wrongdoing. If anything, the Defendant's argument suggests that the Plaintiffs, in their oversight capacity, acted unreasonably because they trusted the Defendant and the representations he made about the Company. This line of argument appears to strengthen the Plaintiffs' allegations that the Defendant violated their trust and breached his fiduciary duty to them in a manner designed to avoid their reasonable oversight. The Defendant compares Ms. Sharpe to an ostrich with her head stuck in the sand [*Id.*]. A more appropriate metaphor would be comparing the Defendant's argument to a fox blaming a rooster after the henhouse has been pillaged. Such a position is inherently disingenuous. For these reasons, the Defendant's Motion to Dismiss, as included in their Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], is DENIED.

### V. <u>The Court Will Not Quash the Plaintiffs' Discovery Efforts</u>

The Defendant characterizes, without evidence, that the Plaintiffs' civil action against him "pervert" this Court's processes [63, at 10] and requests that the Court quash the Plaintiffs' discovery efforts against him because these efforts are allegedly overbroad and they infringe on his constitutional rights. The Defendant fails to provide any support for his allegations that the

11

Plaintiffs' discovery requests are "objectionable" [63, at 14]. Instead, he merely restates them after exclaiming, in a conclusory statement, that the Plaintiffs' effort "may very well be the most breathtakingly overbroad and abusive discovery requests counsel has seen since training summer associates many years ago" [63, 10-14]. The Federal Rules of Civil Procedure requires that objections be made with specificity. See Red. R. Civ. Pro. 34(b)(2)(B-C). Conclusory statements that discovery requests are overly broad are meaningless legalese without specificity and particularity. Setting aside the Defendant's overwrought adynatons, this Court is not inclined to label Plaintiffs' efforts as overbroad in a single, sweeping statement. In point of fact, doing so would be to reward what appears at first blush to be verging toward a violation of Rule 34 of the Federal Rules of Civil Procedure. Thus, the Court refuses to quash the Plaintiffs' discovery efforts whole-cloth on these grounds.

However, the Defendant's second argument, which relates to his "constitutional rights to silence," offers more substance. The Fifth Amendment privilege against compulsory self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972). The privilege is applicable even if there are no criminal charges pending against the witness and even if there is only a remote risk of prosecution. *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087, n. 5 (5th Cir. 1979).

There is a two-part test for determining whether a witness is entitled to assert the privilege and refuse to respond to questioning. *See In re Corrugated Container Antitrust Litig.*, 620 F.2d 1086, 1091 (5th Cir. 1980). "First, the court must determine whether answers to the

questions might tend to reveal that the witness has engaged in criminal activities. If the answers could not be incriminatory, the witness must answer." *Id.* (citing *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 476-80 (1972). If the answers to the questions might incriminate the witness, then the court moves to the second part of the test: determining "whether there is a risk, even a remote risk, that the witness will be prosecuted for the criminal activities that his testimony might touch on." *Id.* "The witness may not establish the privilege by his bald assertion of the privilege." *U.S. v. Goldwin*, 625 F.2d 693, 700 (5th Cir. 1980).

> The trial judge must make a proper inquiry into the legitimacy and scope of the witness' assertion of his Fifth Amendment privilege. A blanket assertion of the privilege without inquiry by the court, is unacceptable. Thus, where the trial judge excused a witness without inquiry about the validity or scope of the witness' claim, this Court has reversed and remanded to the trial court for a hearing to determine whether the witness' fear of self incrimination was justified and, if so, what the boundaries of the witness' Fifth Amendment rights were in relation to the testimony sought by the defendant.

*Id.* at 701.

Additionally, a party invoking the Fifth Amendment in a civil case puts themselves at risk of an adverse inference. *Mitchell v. U.S.*, 526 U.S. 314, 328 (1999). "The rule allowing invocation of the privilege, though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed." *Id.*

Furthermore, the Fifth Amendment only protects people from being incriminated by their own compelled testimony. *U.S. v. Doe*, 465 U.S. 605, 610 (1984). "When the preparation of business records is voluntary, no compulsion is present," and thus the Fifth Amendment is inapplicable. *Id.* A party cannot avoid compliance with discovery "merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his

13

own or that of someone else." *Id.* at 611. In other words, though the act of producing the documents is privileged, the contents of a document are not. *Id.* at 617. As the plaintiffs noted, Justice O'Connor wrote in a 1984 concurrence that the Fifth Amendment "provides absolutely no protection for the contents of private papers of any kind." *Id.* at 618. Similarly, "an individual enjoys no Fifth Amendment privilege from producing records of a collective entity" and "no privilege can be claimed by the custodian of corporate records." *In re Grand Jury Proceedings*, 814 F.2d 190, 192–93 (5th Cir. 1987) (citing *Bellis v. U.S.*, 417 U.S. 85, 88, 100 (1974)).

These principles are applicable in the case at hand. As this Court noted in its Order Quashing Subpoenas Duces Tecum, the Defendant's banking records are ultimately discoverable [60, at 2-3]. This aligns itself with the Supreme Court's holding on the subject, in that the documents themselves are voluntarily prepared as a matter of course, and the Defendant is not compelled to prepare them. The same is true for his tax returns. Additionally, any documentation or records "regarding property or funds held by RJ Wilemon, LLC or Wilemon Foundation" would likely be considered corporate documents, rather than personal ones, and would not be subject to Fifth Amendment protection.

The Defendant has made a blanket statement regarding both the alleged overbreadth of the Plaintiffs' discovery efforts and his rights under the Fifth Amendment. This is prohibited on both counts, as discussed above. Consequently, the Defendant must articulate with specificity why each element of the Plaintiffs' discovery efforts is either overbroad and/or subject to the Defendant's Fifth Amendment right to refuse to incriminate himself. For the reasons noted above, the Defendant's request to quash the Plaintiff's discovery efforts, as included in their Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], is therefore DENIED.

Similarly, without specifics about what the Defendant seeks to protect, a protective order is inappropriate. The Defendant has also not produced any reason why this Court should award him attorney's fees. Thus, the Defendant's request for an award of attorney's fees, as included in their Motion to Stay, Abstain, Or Dismiss, Or for Protective Order [62], is DENIED.

## VI. Conclusion

For the reasons stated above, the Defendant's Motion to Stay, Abstain, or Dismiss, or for Protective Order [62] is DENIED.

The Defendant writes, "It is impossible to read Plaintiffs' breathtakingly overbroad and abusive discovery requests in any manner without finding strong indicia of an intention to pervert the process of this Court to obtain information for Dan's daughter Shonda to use in the parallel state criminal proceeding" [63, at 14]. This statement is breathtakingly wrong. The Defendant would do well to avoid similar grandstanding in future filings. Should he object to the Plaintiffs' discovery requests or seek to invoke his Fifth Amendment rights, he may do so, provided he argues with specificity why each individual request is objectionable. Should the need then arise, a protective order may be appropriate, but the Defendant has yet to provide the contours for what specific information or areas of inquiry he is asking this Court to protect.

An order in accordance with this opinion shall issue this day.

SO ORDERED, this the 31st day of October, 2020.

_____
SENIOR U.S. DISTRICT JUDGE